105 F.3d 1139
 154 L.R.R.M. (BNA) 2353, 133 Lab.Cas. P 11,768
 HENRY FORD HEALTH SYSTEM (95-6173) and Cottage Hospital of
Grosse Pointe (95-6174), Petitioners/Cross-Respondents,
v.
NATIONAL LABOR RELATIONS BOARD (95-6302), Respondent/Cross-Petitioner,
Michigan Association of Police, Intervenor.
 Nos. 95-6173, 95-6174, 95-6302.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 14, 1996.
Decided Feb. 4, 1997.
 
 Stewart J. Katz (argued & briefed), Keller, Thoma, Schwarze, Schwarze, Dubay & Katz, Detroit, MI, for Cottage Hospital of Grosse Pointe and Henry Ford Health Systems.
 Aileen A. Armstrong, Deputy Asso. Gen. Counsel, Peter Winkler (briefed), Vincent J. Falvo, Jr. (argued and briefed), National Labor Relations Board, Washington, DC, for National Labor Relations Board.
 Daniel J. Hoekenga, M. Catherine Farrell (argued and briefed), Hoekenga & Farrell, Southfield, MI, for Michigan Association of Police.
 Before: KENNEDY and BATCHELDER, Circuit Judges; EDGAR*, District Judge.
 KENNEDY, Circuit Judge.
 
 
 1
 In this case, two hospitals petition this court to vacate a supplemental order of the National Labor Relations Board (Board or NLRB) requiring the hospitals to bargain collectively with a union certified as the representative of the guards employed by these hospitals. The Board has submitted a cross-application for enforcement of the supplemental order. The parties dispute the propriety of the Board's underlying decision which found that the Board's certification of the union did not violate section 9(b)(3) of the National Labor Relations Act (NLRA or Act). That section prohibits the Board from certifying a bargaining unit of guards if it admits non-guards. For the following reasons, we will enforce the Board's order.
 
 I. Facts
 A. Background
 
 2
 In a petition filed with the Board in January 1990, the Michigan Association of Police (MAP or the Union), a labor organization, sought to represent a unit including "[a]ll Security officers and Parking officers" employed by Detroit Receiving Hospital/Detroit Medical Center (DMC). Subsequently, MAP and DMC entered into a Stipulated Election Agreement, approved by the Regional Director (Director), which set forth as the appropriate collective-bargaining unit: "All full-time and regular part-time security officers, parking officers and dispatchers employed by [DMC] ... but excluding all group leaders and supervisors as defined in the Act, and all other employees." An election was held and, on March 2, 1990, the NLRB certified MAP to represent a collectivebargaining unit comprised of "[a]ll ... security officers, parking officers and dispatchers."
 
 
 3
 On May 30, 1990, MAP petitioned the NLRB seeking certification to represent a unit of security guards employed by Henry Ford Health System (HFHS). HFHS challenged the certification, claiming that MAP was disqualified under section 9(b)(3) of the NLRA. Specifically, the hospital contended that MAP was disqualified because DMC did not employ "parking officers", but it did employ "parking attendants" and "valet drivers," who were in fact the "parking officers" included in the unit. HFHS argued that these "parking attendants" and "valet drivers" were not statutory guards.
 
 
 4
 On July 13, 1990, the Director issued a decision and direction of election. The Director found that the unit listed on the Certification of Representative for DMC did not include parking attendants and valet drivers, but rather included only "security officers, parking officers and dispatchers." Although the parking attendants and valet drivers may have been on the Excelsior eligibility list[1] and may have voted in the election, the Director reasoned that
 
 
 5
 this falls short of establishing ... that these two classifications are part of the recognized unit. No evidence was presented to establish that DMC and the [Union] have entered into a contract encompassing these two classifications, that DMC recognized or bargained with the [Union] in respect to these two classifications, or that the [Union] has admitted them into membership.
 
 
 6
 Therefore, the Director concluded that HFHS had not established that MAP was disqualified to represent guards under section 9(b)(3).
 
 
 7
 On July 31, 1990, because of the allegations made in the HFHS proceedings regarding the composition of the DMC unit, MAP sent a letter to Dan Zulke, Director of Human Resources at DMC. The letter stated:
 
 
 8
 This is to officially notify you that the Michigan Association of Police as a certified bargaining agent for the guards at Detroit Medical Center, makes no claim to represent non-guard personnel.... As [MAP] intends to represent only guards as defined by the Act in the private sector, it will not make any demands regarding any non-guard employees nor will it admit to membership any private sector non-guards.
 
 
 9
 In addition, on November 9, 1990, MAP sent a letter to Patrick Greaves, Vice President of Human Resources at DMC, because it had come to MAP's attention that a number of parking attendants had been notified by Greaves that their vacation time was not being "brought down" by the hospital because they belonged to the bargaining unit. The letter stated that "[i]t is the Union's position that we do not represent parking attendants nor valet parkers at [DMC]."
 
 
 10
 HFHS declined to recognize or bargain with MAP on the ground that it represented non-guards. MAP filed unfair labor practice charges with the Board and, after investigation, the Board's General Counsel issued a complaint against the hospital, alleging that its refusal to bargain violated sections 8(a)(1) and 8(a)(5) of the NLRA.[2] The hospital admitted the refusal to bargain, but asserted that MAP had been improperly certified because the DMC unit included non-guards.
 
 
 11
 The Board found that the hospital had violated the Act by refusing to bargain with the Union. Henry Ford Health Sys., 303 N.L.R.B. No. 43, 1991 WL 146829 (1991). On January 13, 1992, the Board applied to this Court for enforcement of its orders against three hospitals, including HFHS, which had all asserted the same challenge to MAP's qualifications. While the consolidated case was pending, the Board issued a decision finding that Cottage Hospital also had violated the NLRA by refusing to bargain with MAP. Cottage Hosp. of Grosse Pointe, 306 N.L.R.B. No. 106, 1992 WL 44696 (1992). The Board subsequently applied to this court for enforcement of its order against Cottage Hospital, but the case was suspended while the consolidated case was considered.
 
 B. First Appeal
 
 12
 A panel of this Court affirmed the Board's order in part, but remanded the cases to the Board to reconsider in light of new evidence. NLRB v. Children's Hosp. of Mich., 6 F.3d 1147, 1148 (6th Cir.1993). The hospitals had filed a motion with this Court for consideration of "newly discovered evidence" consisting of: (1) a petition filed by MAP, after the parties had filed their appellate briefs, seeking to clarify the DMC unit, and the resulting order by the Director clarifying that unit by deleting "parking officers" from the certified unit; and (2) testimony of a MAP official in a pre-election hearing at St. Mary's Hospital of Livonia regarding union membership. See id. at 1152. We found that section 10(e) of the NLRA, 29 U.S.C. § 160(e), required that we remand to the NLRB to reconsider its decision regarding the DMC unit in light of this newly discovered "material" evidence.[3] See id. at 1153-54. Subsequently, we remanded the Cottage Hospital case to the Board in light of the same newly discovered evidence. NLRB v. Cottage Hosp. of Grosse Pointe, No. 92-6557, 1994 WL 75919 (6th Cir. Mar.8, 1994).
 
 
 13
 On May 24, 1995, the Board issued a Supplemental Decision and Order, affirming its prior orders.[4] HFHS and Cottage Hospital, the employers remaining in this action, now ask us to set aside this order, while the Board seeks its enforcement.
 
 II. Discussion
 A. Standard of Review
 
 14
 The Board's findings of fact are "conclusive" when supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951). "We will enforce the Board's order if its fact-finding and application of law to facts are supported by substantial evidence, unless the Board has premised its ruling upon an erroneous legal foundation." Dacas Nursing Support Sys., Inc. v. NLRB, 7 F.3d 511, 513 (6th Cir.1993). In reviewing the Board's findings, we may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp., 340 U.S. at 488, 71 S.Ct. at 465; Indiana Cal-Pro, Inc. v. NLRB, 863 F.2d 1292, 1297 (6th Cir.1988).
 
 B. Section 9(b)(3) of the NLRA
 
 15
 Section 9(b) of the NLRA authorizes the Board to determine "the unit appropriate for purposes of collective bargaining." 29 U.S.C. § 159(b). However, Congress has limited the Board's authority through section 9(b)(3), which provides in pertinent part that the Board shall not
 
 
 16
 decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.
 
 
 17
 29 U.S.C. § 159(b)(3). We have explained that guard employees can join a union that also represents non-guards, and that an employer may, if it wishes, recognize such a union for collective bargaining purposes. NLRB v. White Superior Div., White Motor Corp., 404 F.2d 1100, 1103 (6th Cir.1968). However, the Board cannot certify a guard/ non-guard union nor can it compel an employer to recognize such a union as the bargaining agent for its guards. Id.
 
 1. Collateral Litigation of Guard Status
 
 18
 We find it necessary to first address the Board's approach in cases where an employer challenges the certifiability of a guard union. The Board has the primary responsibility for developing and applying national labor policy, and we therefore accord Board rules considerable deference. See NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990). This Court should uphold a Board rule as long as it is rational and consistent with the Act, even if we would have formulated a different rule had we sat on the Board. See id.
 
 
 19
 Although we find that in this case the Board appropriately considered the evidence that the hospitals presented in determining whether the Union represented non-guards in the private sector, the Board did suggest in its conclusion that its decision was based at least in part on its policy that an employer should not be able to question the certifiability of a guard union based on evidence pertaining to the non-guard status of union members employed by other employers. The Board stated:
 
 
 20
 The developments in this case demonstrate the wisdom of the policy set forth in Burns Security Services [, 278 N.L.R.B. 565, 1986 WL 54135 (1986) ] requiring that the noncertifiability of a guard union must be shown by definitive evidence. As the Board recognized in Burns, it would be contrary to the clear intent of Congress to allow an employer to establish noncertifiability by collateral litigation of the guard status of other employer's employees, i.e., by attempting to show that the union "may represent someone somewhere who we would find in an appropriate proceeding is not a guard."
 
 
 21
 Children's Hosp. of Mich., 317 N.L.R.B. 580, 1995 WL 318661 (1995) (quoting Burns Int'l Sec. Servs., Inc., 278 N.L.R.B. 565, 1986 WL 54135 (1986)) (emphasis added). Burns set forth a Board rule that an employer must establish the noncertifiability of a union through "definitive evidence." The Burns Board reasoned that such a standard was necessary in order to ensure the rights of guards to be represented by a union and of guard unions to represent guards. The Board further explained that to apply section 9(b)(3) in a strictly literal fashion would mean that large unions would be uncertifiable because they admit "close-call" non-guards to membership.
 
 
 22
 The Board's requirement that such evidence be definitive is consistent with the requirement that its findings be based on substantial evidence and not on speculation. See 29 U.S.C. § 160(e). Given the Board's presumable desire to avoid dilatory challenges by employers to the validity of a guard union, we recognize the value in requiring concrete evidence that a union does in fact represent non-guards when those alleged non-guards are employed by a different employer. However, we agree with the hospitals that evidence that a union represents non-guards employed by a different employer is relevant to whether a union is certifiable under section 9(b)(3), and the Board must consider such evidence. Congress enacted section 9(b)(3) in order to minimize the danger of divided loyalty that arises when a guard is called upon to enforce the rules of his employer against a fellow union member. See Colon Velez v. Puerto Rico Marine Management, Inc., 957 F.2d 933, 937 (1st Cir.1992); NLRB v. Brinks, Inc., 843 F.2d 448, 451 (11th Cir.1988). "The potential for divided loyalty is present whether or not the same employer is involved." Truck Drivers Local Union No. 807 v. NLRB, 755 F.2d 5, 9 (2d Cir.1985). The plain language of section 9(b)(3) supports this interpretation of the provision's scope. Section 9(b)(3) prohibits certification of a union that admits to membership "employees other than guards," 29 U.S.C. § 159(b)(3), while the Act provides that the term " 'employee' ... shall not be limited to the employees of a particular employer," id. § 152(3) (emphasis added). Thus, section 9(b)(3) covers "employees other than guards" who are represented by the union seeking certification and who are employed by any employer.
 
 
 23
 Here, the Board did evaluate the evidence the hospitals presented. Nevertheless, we disagree with the Board's statement in its conclusion that it would be contrary to the intent of Congress to allow an employer to establish noncertifiability by collateral litigation. Instead, we believe that a policy of requiring definitive evidence but permitting collateral litigation is required by the plain language of the statute. Such a policy appropriately balances the rights of guard unions and guard employees who wish to join such unions with the right of employers not to be compelled to bargain with a union certified in violation of section 9(b)(3). Of course, if an employer is merely contending that the union "may represent someone somewhere" who is not a guard, then the Board would properly conclude that evidence did not support a finding that the union was not certifiable under section 9(b)(3). In sum, an employer may collaterally attack the guard status of other employer's employees, as the hospitals did in this case.
 
 
 24
 2. Does MAP Represent Non-guards in the Private Sector?
 
 
 25
 The hospitals contend that the filing and disposition of the unit clarification petition establishes that the Union admits non-guards to membership. They also argue that the following testimony of a MAP labor relations specialist in proceedings at St. Mary's Hospital conclusively establishes that MAP admitted as members non-guards in the private sector:
 
 
 26
 Q. Okay, when you're certified, when you have an election and you win an election in the private sector, my understanding is that those people that you now represent, they are members of MAP who you then represent?
 
 
 27
 A. Yes, sir....
 
 
 28
 Q. Okay, I think you indicated you're negotiating at Detroit Receiving [DMC]?
 
 
 29
 A. I believe that's one of the hospitals that they are at the table.
 
 
 30
 Q. Okay. And the unit that you were certified for, the people in that unit, they are members of MAP?
 
 
 31
 A. Correct.
 
 
 32
 Children's Hosp. of Mich., 6 F.3d at 1152 n. 1. This evidence, the hospitals contend, establishes that MAP represents parking attendants and valet drivers at DMC. However, we find that the record as a whole, including the newly discovered evidence, supports the Board's conclusion that MAP does not represent non-guards in the private sector.
 
 
 33
 First, substantial evidence supports the Board's determination that the unit clarification did not establish that the DMC unit included non-guards. As the Board stated, the unit clarification procedure was a way for the Union to attempt to resolve this issue once and for all. Moreover, in filing the petition, MAP in no way admitted that the parking attendants and valet drivers were included in the unit at that time. MAP perhaps should have sought a clarification earlier, but the record reveals that it had made numerous attempts through letters to DMC officials to establish that it did not intend to represent the parking attendants and valet drivers.
 
 
 34
 Moreover, substantial evidence supports the primary basis of the Director's decision to clarify the unit. Specifically, the Director found:
 
 
 35
 The literal language of the unit description at issue does not include parking attendants nor valet drivers, nor is there substantial evidence that [MAP] has ever sought to represent such employees. The inclusion of the classification "parking officer" under such circumstances does not compel the conclusion that [MAP] sought to include non-guard employees, particularly in light of the use of the designation, "officer," in the classification, which has obvious implications as to the guard issue. While I do not conclude that parking attendants and valet drivers are encompassed by the unit description, I conclude that it is nonetheless appropriate to clarify the unit to exclude a non-existent classification. Alternatively, if the term, "parking officer," is viewed as encompassing the parking attendants and valet drivers, I find that they are not guards as defined in the Act and therefore should be excluded from the unit.
 
 
 36
 (emphasis added). Because we find support in the record for the Director's principal holding, his alternative holding does not impact our determination that the record as a whole supports the Board's conclusions regarding the clarification of the DMC unit.
 
 
 37
 Furthermore, the Board reasonably concluded that the St. Mary's Hospital testimony did not prove that MAP represents non-guards in the private sector. The MAP official stated that the Union represents employees in a unit, but he said nothing about who is actually in the DMC unit or any other unit for that matter. Moreover, later testimony suggests that the MAP official did not believe that MAP represented non-guards in the private sector.[5] Indeed, MAP's constitution provides that "[a]n individual or organization shall be eligible for membership as long as: (a) The individual is a law enforcement officer[;] (b) The organization is composed of law enforcement officers." See The Wackenhut Corp., Case No. 7-RM-1316 (N.L.R.B. Sept. 23, 1987).
 
 
 38
 The hospitals have presented no evidence that MAP has attempted to bargain on behalf of the parking attendants and valet drivers, to initiate them as members of the Union, or to collect dues from them. See NLRB v. J.W. Mays, Inc., 675 F.2d 442, 444 (2d Cir.1982) (per curiam). In contrast, the Union has advised DMC in writing on a couple of occasions that it does not represent its parking attendants or valet drivers and that it will not admit them to membership. The record therefore supports the Board's conclusion that the Union did not represent non-guards in the private sector. Accordingly, the hospitals violated sections 8(a)(1) and 8(a)(5) of the NLRA when they refused to bargain in good faith with the Union.
 
 3. William Beaumont Hospital Evidence
 
 39
 The hospitals also argue that the Union represents a unit of security guards and entrance attendants at William Beaumont Hospital (Beaumont) and that the entrance attendants are not statutory guards. Evidence pertaining to this allegation was newly discovered while the case was on remand to the Board. The Board chose to consider the evidence, so we appropriately review its findings. See 29 U.S.C. § 160(e).
 
 
 40
 To support their claim, the hospitals proffered an affidavit of David Misner, Beaumont's Director of Human Resources, with attachments consisting of job descriptions for security officers and entrance attendants. The Board first found that the evidence was irrelevant in terms of whether the hospitals had committed unfair labor practices because the Union was certified at Beaumont after the hospitals in this case refused to bargain with MAP. The Board also found, however, that the evidence failed to establish that the Union admits non-guards to membership at Beaumont, because Beaumont had stipulated that the entrance attendants were statutory guards and because the unit description specifically included only individuals "employed ... as guards within the meaning of Section 9(b)(3) of the Act."
 
 
 41
 The Board reasonably concluded that the Beaumont evidence is not relevant to the issue in this case, namely whether the hospitals committed unfair labor practices. As we explained in our previous decision in this case, "[s]ince the hospitals are challenging the certification at the time that the certification order was issued, the question is whether the Board could certify the union as the representative of the hospitals' guard units at the time that it ordered the certifications." Children's Hosp. of Mich., 6 F.3d at 1154 (emphasis added). Although decertification would be appropriate if the hospitals prove that the Union has subsequently organized or admitted non-guards, see J.W. Mays, Inc., 675 F.2d at 444, it would not excuse the hospitals' prior refusal to bargain. Thus, this evidence does not affect our conclusion that the hospitals have violated sections 8(a)(1) and 8(a)(5) of the NLRA.
 
 
 42
 Nevertheless, we do question the Board's additional finding regarding the Beaumont stipulation. Although a pre-election agreement is a binding contract between the parties, see Dacas Nursing Support Sys., Inc., 7 F.3d at 513, "[e]ven if the pre-election stipulation clearly indicates which employees are eligible to vote, it has been held on numerous occasions that the inclusion or exclusion of employees in a unit per a pre-election stipulation may not contravene or violate the NLRA or established or settled Board policy," NLRB v. Speedway Petroleum, 768 F.2d 151, 155 (7th Cir.1985); see also Dacas Nursing Support Sys., Inc., 7 F.3d at 515. Thus, even if an employer and a union agree that certain employees qualify as statutory guards, the legal standard ultimately controls that determination.
 
 
 43
 The Beaumont situation appears to be newly discovered evidence, and the Board should perhaps have conducted a hearing to determine whether the entrance attendants are in fact guards. However, we find that it would be more appropriate for this issue to be treated through a petition to revoke MAP's certification, since we have determined that the hospitals have unlawfully refused to bargain with MAP, at least up until the time the Union may have admitted non-guards employed by Beaumont. As is appropriate under section 10(e), we express no opinion with regard to the Beaumont evidence or the guard status of the Beaumont entrance attendants.
 
 III. Conclusion
 
 44
 For the foregoing reasons, we will enforce the Board's order.
 
 
 
 *
 The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 In Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966), the Board held that shortly after the scheduling of an election, an employer must provide the Board with a list of the names and addresses of all employees eligible to vote. The Board then furnishes this list to the union
 
 
 [2]
 Section 8 of the NLRA provides in pertinent part:
 (a) Unfair labor practices for an employer
 It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 ....
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 29 U.S.C. § 158(a)(1), (a)(5).
 
 
 [3]
 Section 10(e) provides in pertinent part:
 If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record.
 29 U.S.C. § 160(e).
 
 
 [4]
 Our decision in the prior appeal suggested that the issue on remand was "whether parking officers or parking attendants are considered guards and whether the inclusion of a few of them will disqualify a union." 6 F.3d at 1151. However, the Board did not address this legal question because it decided that the hospitals had presented no definitive evidence that the DMC unit included non-guards. The Board's approach was appropriate in spite of the panel's suggestion that the "new evidence" had conclusively established that the DMC unit included non-guards. As we acknowledged in the first appeal, we could not consider this evidence on our own, see 6 F.3d at 1153-54, and we did not mean to suggest otherwise
 
 
 [5]
 The relevant testimony was as follows:
 Q. Does MAP admit to membership employees who are classified other than guards?
 A. In hospital settings?
 Q. Period.
 A. We have police officers in the [Union], yes, sir.
 Q. Anyone other than guards and police officers?
 A. We have police dispatchers. I believe that's it.